# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Michael T. B.,                                    Case No. 20-cv-1779 (WMW/ECW)

        Plaintiff,

v.                                                **REPORT AND RECOMMENDATION**

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

        Defendant.

This matter is before the Court on Plaintiff Michael T. B.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 21) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant") Motion for Summary Judgment (Dkt. 23.) Plaintiff filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Plaintiff's Motion be denied, and Defendant's Cross-Motion be granted.

## I.      BACKGROUND

On July 11, 2017, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability as of January 31, 2017. (R. 15.)[1]  His

---

[1]      The Social Security Administrative Record ("R.") is available at Dkt. 20.

application was denied initially on December 1, 2017, and on reconsideration on February 5, 2018.  (R. 186-191, 193-96.)  Plaintiff filed a written request for a hearing, and on September 20, 2019, Plaintiff appeared and testified at a hearing before Administrative Law Judge Erin T. Schmidt ("the ALJ").  (R. 197-98, 215, 30-95.)  The ALJ issued an unfavorable decision on November 22, 2019, finding that Plaintiff was not disabled.  (R. 12-28.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since January 31, 2017, the alleged onset date of disability. (R. 17.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative joint disease and degenerative disc disease of the lumbar spine.  (R. 17.)

---

[2]     The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 18.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally reach overhead bilaterally.  He can frequently handle, finger, and reach in all other directions with the right, upper extremity.  He can occasionally stoop, kneel, crouch, crawl, and climb.  He can tolerate no more than occasional exposure to vibrations.

(R. 18-22.)

Based on the testimony of the vocational expert and a review of the record, the ALJ found at step four that Plaintiff was capable of performing his past relevant work as:

- Marker, DOT code 209.587-034, light level of exertion, unskilled work with a specific vocational preparation of 2, and that Plaintiff had performed it at the light exertional level.  (R. 22.)

- Project Manager, DOT code 869.367.010, sedentary exertional level, skilled work with a specific vocational preparation of 7, and that Plaintiff had performed it at the sedentary exertional level.  (R. 22.)

The ALJ found that the Plaintiff's past relevant work "does not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity (20 CFR 404.1565)."  (R. 22.)  The ALJ also noted that the vocational expert's testimony accurately reflected Plaintiff's residual functional capacity and vocational background.  (R. 22.)

3

Plaintiff requested review of the decision, and the Appeals Council denied

Plaintiff's request for review, which made the ALJ's decision the final decision of the

Commissioner. (R. 1-3.) Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular

attention to the facts and records cited by the parties. The Court will recount the facts of

the record only to the extent they are helpful for context or necessary for resolution of the

specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

### A.    Medical Record

Plaintiff's complaints of extensive back, neck, and leg pain began after a vehicle

accident on September 12, 2002. (R. 400.) Plaintiff had reported to Mathew J. Eckman,

MD, for annual reviews in 2008 and 2009 of his neuromusculoskeletal complaints,

particularly on his cervical, thoracic, and lumbar spine, and began seeing David J. Mast,

MD, on January 29, 2010 for his pain. (R. 400-09, 437-440.) In 2011, Plaintiff reported

that he had chronic low back pain resulting from working as a plumber/fitter and lifting

300-pound objects, a motorcycle accident, and the vehicle accident in 2002. (R. 480.)

Since his accident in 2002, Plaintiff had received epidural injections at the L3-4

interspace, which improved his mobility, had multiple imaging studies performed of his

back, and MRIs of the cervical, thoracic, and lumbar spines. (R. 451-52, 487-88, 491-93,

495-97.)

On April 22, 2010, an MRI of Plaintiff's cervical spine showed severe endplate

degenerative changes and diffuse annular bulge and prominent endplate osteophytes at

C5-6 (causes severe bilateral foraminal stenosis, slightly worse on the right when compared to the left). (R. 497.) There were also severe degenerative changes at C6-7 which demonstrated an annular bulge resulting in severe right foraminal stenosis and moderately severe to severe narrowing of the left neural foramen, associated with annular bulging and prominent endplate osteophyte formation. (R. 497-98.) There was a suggestion of mass effect on the intraforaminal portions of the C6 nerve roots at the C5-6 level and potential mass effect on the right C7 nerve root and dorsal root ganglion at the C6-7 level. (R. 497-98.)

An MRI of Plaintiff's thoracic spine also taken on April 22, 2010 showed no appreciable abnormality that accounted for Plaintiff's discomfort and no evidence of fracture within the thoracic spine or rib fracture. (R. 498-99.) However, there was a small right paracentral protrusion at T8-9 and tiny right paracentral protrusion at T7-8, which imparted minimal mass effect on the ventral aspect of the sac without evidence of neural compromise. (R. 498-99.)

On April 22, 2010, an MRI of Plaintiff's lumbar spine was taken. (R. 499-500.) It showed: an interval enlargement of an annular bulge at L3-4 resulting in bilateral lateral recess narrowing suggesting the possibility of intermittent mass effect on the exiting L4 nerve root bilaterally; an annular tear within the disc at L3-4 that possibly accounted for some of Plaintiff's discomfort; and new bony ankylosis of the SI joints that was potentially concerning for ankylosing spondylitis. (R. 499-500.)

Plaintiff underwent a neurosurgical consultation with Marshall Watson, MD, on May 17, 2010 for his cervical, thoracic, and lumbar pain, as well as pain from his neck to

5

tailbone, tingling in his bilateral hands, intermittent pain in his buttocks, and tingling and throbbing pain in both legs. (R. 433.) The report from that visit notes that Plaintiff had experienced back pain for many years, however, his symptoms dramatically worsened after the 2002 car accident. (R. 435.) Dr. Watson stated in the report that "it can be somewhat difficult to pin down specific symptoms from" Plaintiff, and that while he thought some of Plaintiff's symptoms were coming from dysfunction at C5-6, C6-7, and L3-4, he was concerned that performing fusion surgery at any or all of those levels or disc arthroplasty was not going to substantially improve Plaintiff's overall level of pain and functioning, and that he saw no reason to rush into any surgical intervention to improve Plaintiff's symptoms. (R. 435-436.)

Plaintiff underwent a rheumatology consultation on May 10, 2010 that showed a full range of motion of the cervical spine of his neck and normal maintenance of lumbar lordosis in the back with no significant paraspinal muscle spasm and no focal areas of definable tenderness throughout the entire spine, as well as no SI joint tenderness. (R. 451-53.) X-rays of his sacroiliac joints during that visit showed some arthritis and narrowing of Plaintiff's left sacroiliac joint, which suggested some early degenerative arthritis in his hips, although the joints themselves appeared well preserved. (R. 467.)

Due to concerns regarding some ligamentous instability in Plaintiff's cervical spine, Dr. Mast referred Plaintiff to Dr. Jed Downs for evaluation, and on April 16, 2010, Dr. Mast opined that Plaintiff was feeling a little better, however, it was difficult for him to work beyond a few hours at a time and as a result, difficult for Plaintiff to be gainfully employed as a plumber. (R. 442, 444.) On April 28, 2010, Dr. Mast reported that

Plaintiff's pathology showed "among the worst that [Plaintiff] ha[d] in the cervical MRI at C5-6 and C6-7 bilateral foraminal stenosis and mass effect at about C5-6." (R. 447.)

On January 30, 2012, Dr. Mast reported that Plaintiff was continuing to have ongoing pain, including in his lower back, which was "[w]orse on the left side in the lumbar radicular type of pattern and increasing now [Dr. Mast was] suspecting in his sacroiliac joint." (R. 455, 457.) Plaintiff underwent a SI joint dysfunction/LT SI joint injection on February 6, 2012, which, as reported by Plaintiff, decreased pain in his left leg. (R. 662.) A MRI examination of the sacrum without contrast taken on July 3, 2012 showed evidence of prior spontaneous fusion of the anterior superior portions of Plaintiff's sacroiliac joints on both sides with no abnormality seen. (R. 645.) On August 27, 2012, Plaintiff underwent a myelogram lumbar procedure for his back, showing uncomplicated lumbar myelogram and bulging discs. (R. 641.) A CT myelogram lumbar spine with intrathecal contrast, also taken on August 27, 2012, showed a finding of normal alignment of Plaintiff's lumbar spine, bulging disc at L3-L4 with mild to moderate central canal stenosis, L4-L5 disc bulging with mild central canal stenosis, and L2-L3 mild disc bulging with minimal central canal stenosis. (R. 639.)

An exam performed on April 15, 2013 showed Plaintiff had "exquisite tenderness over his coccyx radiating into his right buttocks," and he received coccyx injections to relieve the pain. (R. 664-68.) Plaintiff underwent a coccyxectomy on March 16, 2014 and engaged in physical therapy for his lower back from July through October 2014 where he noted that his pain level typically rose after he went up and down the stairs, mowed his lawn, and after picking a couple "bussle of apples" and that the pain

prevented him from sleeping well at night and created upper back and neck pain for him. (R. 673-707.) During the course of his physical therapy, Plaintiff also reported intermittent relief of pain, an increased tolerance to sitting postures, and decreased complaints of upper lumbar/lower thoracic discomfort with sitting positioning. (R. 684.)

After an MRI of Plaintiff's knee showed a large degenerative tear of the medial meniscus, a large effusion, smaller degenerative tear of the lateral meniscus, prominent medial synovial plica and a chronic degenerative tear of the posterior cruciate ligament with early primary osteoarthritis, primarily at the medial and patellofemoral compartments, on August 11, 2017, Plaintiff underwent a left knee arthroscopic debridement with partial medial and lateral meniscectomies, synovial plica excision, and evaluation without repair to the posterior cruciate ligament. (R. 716-17, 720.) After that procedure, on August 24, 2017, Plaintiff complained that he had continued pain which was worse than it was prior to undergoing surgery, and his physical examination from the visit showed a persistence of knee effusion, however, his gross exam was unremarkable and showed an active range of motion from 10-degree extension to 95 degrees of flexion. (R. 735-38.) Dr. David Rust's orthopedic progress note of September 12, 2017 showed Plaintiff reported he was having less pain and swelling on the left knee and was overall happy after the arthroscopic debridement, but Plaintiff however reported sharp aching anterolateral pain radiating along the deltoid in his left shoulder. (R. 742.) Dr. Rust concluded in that progress note that Plaintiff's left knee had healed surgical incisions with moderate quad weakness but appeared better, he had no joint tenderness, and that Plaintiff's left shoulder had decreased forward flexion and internal rotation. (R. 745.)

8

Plaintiff's physical therapy evaluation report of his lower extremity dated August 31, 2017 shows Plaintiff complained of having had difficulty bending his knee for the past year and a half and that he was informed by a medical doctor that he had a lot of arthritis in his knee which was affected by him standing, twisting, going up and down stairs, and sitting in a recliner, however, the symptoms decreased with pain medication and ice. (R. 727, 731.)

An MRI of Plaintiff's left shoulder taken on July 7, 2017 detailed a rotator cuff tear. (R. 722.) On October 13, 2017, Plaintiff underwent a left shoulder arthroscopic rotator cuff repair and biceps subpectoral open biceps tenodesis, performed by Dr. Rust. (R. 785-87.) Dr. Rust's orthopedic progress note of November 21, 2017 showed that Plaintiff was doing fairly well following his left shoulder surgery, was attending physical therapy, still had some lateral soreness but there was no soreness over his biceps tendon. (R. 823.) That progress note reports Plaintiff's surgical incisions were well healed on the shoulder and knee, that Plaintiff had good passive range of motion in the left shoulder, weakness with elevation and external rotation, no discomfort or pain over the biceps and good symmetry at the biceps tenodesis site, and that his knee had a good range of motion with some mild quad weakness and a little bit of tenderness over the medial plica area. (R. 826.) Plaintiff began upper extremity evaluations of his left shoulder on November 2, 2017, and on November 24, 2017, Plaintiff noted that his left shoulder was feeling okay and was not too sore, however, during his evaluation visit on November 28, 2017, Plaintiff stated that his arm continued to feel sore and was limiting his sleep. (R. 858.)

During Plaintiff's upper extremity evaluation of his left shoulder on December 5, 2017, Plaintiff stated that he retrieved a box of Christmas lights off a shelf and had increased pain in his left shoulder which continued to be sore, and the report shows Plaintiff had very poor strength with evaluation.  (R. 860-61.)  The upper extremity evaluation report of his left shoulder of December 8, 2017 shows Plaintiff's pain had not worsened since his incident of lifting the box of Christmas lights off a shelf, however, his pain had not subsided either.  (R. 862.)  Plaintiff's upper extremity evaluation report of his left shoulder of January 2, 2018 shows Plaintiff was progressing slowly due to high pain levels, which may have been due to possible reinjury in the week of December 2, 2017.  (R. 871.)  As of the upper extremity report of his left shoulder dated June 14, 2018, Plaintiff continued to report pain with his left shoulder, however, the progress summary states that all stated goals had been met including the end functional goals for Plaintiff to be able to perform all daily activities without significant limitations from his left upper extremity in twelve weeks.  (R. 993.)

Due to Plaintiff's sluggish pace of healing and constant complaints, another MRI was performed on his left shoulder on March 20, 2018.  (R. 962.)  On July 10, 2018, Plaintiff presented for ongoing left shoulder pain and weakness, noting that he had an injection on April 10, 2018 which alleviated his pain and slowly helped him regain strength and mobility.  (R. 930.)   That July 2018 medical report states that Plaintiff could actively "raise his arm to about 120 degrees," could passively raise his arm to 175

degrees, and could resist pressure in all directions with negative speed and Yergason's[3].
(R. 932.)  At that time, Plaintiff was encouraged to continue rehab as Dr. Rust did not
think that any further surgical intervention or imaging was necessary.  (R. 932.)

Per Dr. Rust's report dated January 3, 2019, Plaintiff stated that his left knee and
left shoulder were both doing well, however, he had increasing pain in his right knee
which had a sudden onset of swelling, especially with bending or twisting.  (R. 921.)  In
January 2019, Dr. Rust reviewed an x-ray of Plaintiff's right knee which showed mild
degenerative changes without severe arthrosis fracture or trauma, and an MRI showed
Plaintiff had a tear of the medial meniscus extending from the posterior horn to the
midbody with mild effusion and mild chondromalacia of the medial and patellofemoral
compartments, but not severe arthrosis.  (R. 924, 959-60.)  As a result, Plaintiff
underwent a right knee arthroscopic partial medial meniscectomy on February 8, 2019,
performed by Dr. Rust.  (R. 912.)  Dr. Rust's report dated April 18, 2019 shows Plaintiff
had some stiffness start-up pain and achiness in his right knee, difficulty bending or
kneeling, but overall, had less frequent locking and swelling than preoperatively; Plaintiff
was happy with how his knee felt; and Plaintiff's general examination showed he had a

---

[3]    A positive speed test "consists of pain elicited in the bicipital groove when the
patient attempts to forward elevate the shoulder against examiner resistance; the elbow is
slightly flexed, and the forearm is supinated."  A positive Yergason test "is noted if the
patient reports pain over the bicipital groove and/or subluxation of the LHB tendon."
Matthew Varacallo & Scott D. Mair, *Proximal Biceps Tendinitis and Tendinopathy*,
Nat'l. Ctr. for Biotechnology Info. (July 18, 2021),
https://www.ncbi.nlm.nih.gov/books/NBK533002/.

range of motion of 0-120 degrees and did not have significant pain with McMurray's maneuver but "had some mild crepitance." (R. 904-06.)

On May 7, 2019, Plaintiff reported with complaints of bilateral knee pain, and his outpatient evaluation report following his right knee arthroscopy showed Plaintiff reported chronic low back pain with demonstrated limitations in his lumbar active range of motion. (R. 889-90.) On May 23, 2019, Plaintiff reported increased neck and back pain, and on May 28, 2019, he reported that it was hard to tell if there was any change in his knee pain and that he felt tingling in his ankles and feet. (R. 894-95.) Plaintiff's outpatient evaluation dated June 6, 2019 shows Plaintiff reported minimal overall change in his right knee pain or function through physical therapy treatment, and he was advised to engage in home exercises and follow up with Dr. Rust if there were no changes in his knee pain in the next one to two months. (R. 901.)

## B.   Dr. Mast's Medical Source Statements and Letters

On February 20, 2018, Dr. Mast provided a medical source statement regarding Plaintiff's ability to do physical work-related activities, in which he opined that Plaintiff was restricted to occasionally lifting and/or carrying twenty pounds and frequent lifting of less than ten pounds. (R. 873.) Dr. Mast also opined that Plaintiff could stand and/or walk less than two hours in an 8-hour workday and could sit less than six hours in an 8-hour workday, and that Plaintiff needed to alternate sitting and standing to relieve pain or discomfort. (R. 873-874.) Dr. Mast was prompted to "provide an explanation and medical basis for" his opinions as to sitting, standing, walking, pushing, and pulling, and responded that:

[F]requent [change][4] in position is required.  Frequent resting (perhaps of 30 [minutes] to relieve pain) will allow return to work to some capacity.  But perhaps max. tolerability of 4 hours in a 24 [hour] period or 8 [hour] shift.

(R. 874 ¶ 7.)

Dr. Mast further opined that Plaintiff was limited to the following neck movements on a frequent basis: flexion, extension, rotation, and static (fixed position) and limited to the following postural activities on an occasional basis: climbing (ramps/stairs/ladder/rope/scaffold), balancing, kneeling, crouching, crawling, and stooping (bending body downward and forward by bending spine at waist).  (R. 874-875.)  According to Dr. Mast, due to Plaintiff's significant hand arthritis, Plaintiff could occasionally reach overhead with his right hand and could frequently reach in all other directions with his right hand, as well as could frequently handle, finger, and feel with his right hand.  (R. 875.)  Dr. Mast opined that Plaintiff could never reach overhead with his left hand and could perform the following activities with his left hand on a frequent basis: reach in all other directions, handle, finger, and feel.  (R. 875.)  As to environmental limitations, Dr. Mast opined that Plaintiff was to avoid concentrated vibration exposure.  (R. 876.)

In an accompanying letter to his medical source statement, Dr. Mast stated that Plaintiff's structural limitations made it impossible for him to put in a straight 8-hour workday; Plaintiff was no longer "able to keep up to the rigors of full-time employment in his learned trades as plumber/boilermaker"; Plaintiff had been advised by physicians

---

[4]      Dr. Mast used the Greek symbol "Δ" ("delta"), which the Court understands to mean "change."

against heavy stressors on his spine, "particularly such as frequent overhead work, bumping, vibrating or jarring activities, or lifting heavy objects repeatedly, or prolonged sitting or standing"; and Plaintiff "needs to be able to work on his own time schedule and adjust his position when needed, and this is not possible with regular employment." (R. 877-878.) As a result, Dr. Mast concluded that Plaintiff was "unable to pursue the standard activities such as are needed for his trained employment." (R. 878.) The letter was originally dated March 11, 2015, but Dr. Mast crossed out that date and replaced it with a handwritten date of February 20, 2018, and "certif[ied]" that the information in the letter "remains current." (R. 877-878.)

On August 23, 2019, Dr. Mast provided another medical source statement regarding Plaintiff's ability to do physical work-related activities. (R. 1006-1009.) He opined in that statement that Plaintiff was restricted to occasionally lifting and/or carrying twenty pounds and frequent lifting and/or carrying less than ten pounds. (R. 1006.) Dr. Mast also opined that Plaintiff could stand and/or walk at least two hours in an 8-hour workday, which was an improvement from Dr. Mast's February 20, 2018 statement that Plaintiff could stand and/or walk less than two hours in an 8-hour workday; that Plaintiff could sit less than six hours in an 8-hour workday; and that Plaintiff needed to alternate between sitting and standing to relieve pain or discomfort. (R. 1006-1007.) Dr. Mast opined that Plaintiff was limited to climbing, balancing, and stooping on an occasional basis and was never to kneel, crouch, and crawl. (R. 1007-1008.) Dr. Mast further opined that Plaintiff could perform the following activities with his right hand occasionally: reach overhead and in all other directions, handle and finger; and could feel

continuously.  (R. 1008.)  Dr. Mast opined that Plaintiff could never reach overhead with his left hand, could occasionally handle, finger, and reach in all other directions, and could feel continuously.  (R. 1008.)  As to his environmental limitations, Dr. Mast opined that Plaintiff was to avoid concentrated noise, fumes, odors, dusts, gases, and poor ventilation exposures and should avoid even moderate extreme cold, vibration, and hazards (machinery and heights) exposures.  (R. 1009.)  In response to the question regarding medical/clinical findings supporting his conclusions, Dr. Mast wrote "[s]evere degen[erative] arthritis."  (R. 1007.)

Dr. Mast attached the same March 11, 2015 letter to the August 23, 2019 statement as was attached to his February 20, 2018 medical source statement.  (R. 1010-1011.)  At the end of the letter, Dr. Mast included a handwritten date of August 23, 2019 on it and stated that as of that date, Plaintiff now had severe limitations of his left arm due to a poor outcome from his left shoulder arthroscopy for a damaged rotator cuff.  (R. 1011.)

## C.    Dr. Chang's Opinions on Reconsideration

Relevant to Plaintiff's appeal, Douglas Chang, MD, provided his medical opinion as to Plaintiff's RFC on reconsideration on January 20, 2018.  (R. 175-178.)  Dr. Chang limited Plaintiff to occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds, and unlimited pushing and/or pulling except as to the lifting and/or carrying restrictions.  (R. 175-176.)  Dr. Chang opined that Plaintiff could stand and/or walk (with normal breaks) for about six hours in an 8-hour workday and could sit (with normal breaks) about six hours in an 8-hour workday.  (R. 176.)  He limited

Plaintiff to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; balancing, stooping (bending at the waist); kneeling, crouching (bending at the knees); and crawling. (R. 176.) As to manipulative limitations, Dr. Chang limited Plaintiff to occasional left upper extremity overhead reaching and frequently handling and fingering with the right hand. (R. 176-177.) Dr. Chang opined that Plaintiff had no visual, communicative, or environmental limitations. (R. 177.) Dr. Chang noted that Plaintiff failed to attend his orthopedic consultative examination and opined that it was "reasonable to assume that after healing from both his knee procedure on 8/11/17 and the left shoulder surgery which has yet to be determined that he would be able to function within the parameters in this RFC." (R. 178.) Dr. Chang opined that Plaintiff was likely to be able to walk six hours in an 8-hour workday barring any unusual complication after his knee surgery and that the RFC took into account the anticipated shoulder surgery. (R. 178.)

D.    **Plaintiff's Testimony**

At the hearing, Plaintiff testified that having his hands in front of him to type bothered his neck and upper back, which affected his focus and concentration when he worked as an estimator. (R. 44.) According to Plaintiff, his focus and concentration had since gotten worse because the pain got so bad that it affected his ability to discern where he was or what he was doing, which was triggered by using his arms, looking up or down, standing, or kneeling. (R. 44-45.) Plaintiff testified that he was able to stand for fifteen to twenty minutes without leaning on anything, walk three to four blocks on a great day, and was only able to walk to the bathroom on a really bad day. (R. 45-46.) At the hearing, Plaintiff had his hand underneath his buttocks while sitting in a "straight-

16

back chair" because his "tailbone ha[d] been removed and it's hard to sit in a chair." (R. 46-27.)  Plaintiff testified that he purchased a chair that he was able to sit on for a half-hour at a time, reaching out in front of him affected his shoulders, and he was only able to reach over his head with his left arm. (R. 46-47.)  Plaintiff is right-hand dominant but was able to reach over his head with his right hand repetitively depending on how bad it was hurting and "there'[re] good days and bad days." (R. 47-48.)  Plaintiff was able to close his hands at about a half-of-a-fist. (R. 48.)  Test results from the Department of Vocational Rehabilitation showed he could type three to five words per minute for a short period of time. (R. 48-49.)  When handling big objects with his hands, Plaintiff testified that he was able to hold them for "so long" before dropping them. (R. 49.)

Plaintiff testified that he had "bad days" a couple of times a week. (R. 55.)  Generally, on bad days, he would wake up with headaches due to his neck problems, and depending on the pain in his upper, mid, and lower back, he sometimes would stay put and lie on a heating pad. (R. 50.)  He had one of his "good days" the day prior to the hearing and picked a bushel basket of apples from a chest-level apple tree in the backyard of his home for about a half-hour which affected his back, and so, he had to lie on a heating pad for the rest of the day. (R. 49-51, 55.)  He was unable to sleep due to the pain. (R. 52.)

Plaintiff testified that he had resided with his significant other for the past six to seven years because his home was inhabitable and that his significant other took care of and supported him. (R. 51-52, 59-62.)  However, Plaintiff visited his home a couple of times a week. (R. 61.)  Plaintiff testified that his significant other solely does all the

cooking, cleaning, grocery shopping, lawn mowing, snow-blowing, and laundry. (R. 51-52, 60.) Plaintiff did not partake in any of those activities because he "can't do it." (R. 52.) Plaintiff paid the insurance and electric bill for his significant other's home using his savings. (R. 62.) Plaintiff testified that he previously had surgery on his left shoulder and planned on having surgery on his right shoulder as well but had not done so yet due to advice received from his internal medicine doctor, Dr. Mast. (R. 52-53.)

While Plaintiff previously was interested in becoming a financial advisor, he testified that he did not proceed with that career path because it would involve him sitting in a chair "and sitting in a chair is not fun," and he did not obtain a position with the Department of Natural Resources because the job required him to sometimes ride a four-wheeler which he stated he was unable to do. (R. 56-58.) Prior to his accident in 2002, Plaintiff was able to lift thirty-five pounds frequently, however, at the time of the hearing, he testified that he was occasionally able to lift thirty-five pounds and when he did, it affected his neck and back. (R. 57.) He was involved in the Connect 700 Program to aid in his job search and testified that he was not qualified for the jobs he applied to, including a position that entailed maintaining the Veterans cemetery, and had not applied to any other jobs "because it's hard to find something that [he] may be able to do" and there were lots of restrictions on what he can do. (R. 58-59.)

At the hearing, Plaintiff testified that while working at Apex from 2006 to 2009, he was tasked with estimating mechanical projects which required him to go out in the field to determine the requirements of specific jobs in order for him to assess the prices of said jobs. (R. 39-40, 42.) However, due to Plaintiff's testimony that his memory was

bad and the inconsistencies between his testimony at the hearing and the prior work history report Plaintiff submitted in support of his claim, the ALJ noted that she would rely on the work history report since it was "completed closer to when the actual work was done." (R. 35-38.) Plaintiff's attorney was given the opportunity to object to this approach, but did not do so. (R. 38.) Referencing Plaintiff's work history report, the ALJ noted that Plaintiff did not work as an estimator at Apex from 2006 to 2009 but worked as a project manager. (*Id.*)

## E.    Vocational Expert's Testimony

Vocational Expert Kimberly E. Eisenhuth ("the VE") also testified at the hearing before the ALJ. (R. 63.) The VE submitted an analysis of Plaintiff's work history prior to the hearing that categorized Plaintiff's past work as: assistant construction superintendent, which is light/skilled work; estimator, which is sedentary/skilled work; and president, which is sedentary/highly-skilled work. (R. 63-64.) For clarification purposes regarding Plaintiff's work history, the ALJ directed the VE to the prior administrative law judge's decision for Plaintiff's previous disability claims and the prior determinations in his current disability claim. (R. 64.)

The VE testified that the product manager position referenced by the ALJ to have been performed by Plaintiff from 2006 to 2009 at Apex was to be classified as assistant construction superintendent per the Dictionary of Occupation Titles ("DOT") which has a code of 869.367-010, is skilled work with a light exertional level (but performed at sedentary exertional level per Plaintiff's work history report), with a specific vocational

preparation ("SVP") of 7 that requires two to four years for an individual to learn the job. (R. 64-65, 76-77.)

When asked about the DOT classification for Plaintiff's estimator position, the VE responded that there appeared to be some confusion based on Plaintiff's testimony that he worked as an estimator at Apex (from 2006 to 2009) and the ALJ's impression that Plaintiff worked as an estimator at Dryke Plumbing & Heating from November 2013 to July 2015 per Plaintiff's work history report. (R. 65-66.) Following the ALJ's reasoning as to when Plaintiff held the estimator's position, the VE confirmed that the DOT code for "estimator" is 169.267-038, sedentary per DOT with an SVP of 7, but performed at light exertional level by Plaintiff. (R. 66.) Given the classification of the estimator job as sedentary per the DOT, Plaintiff's counsel asked the VE if there was a title in the DOT that better accurately described the job since Plaintiff performed it at the light level. (R. 74.) After the VE reviewed the DOT to determine whether Plaintiff's work description fell into any estimator categories, she concluded that given the SVP of 7 which requires two to four years to learn the job and because Plaintiff performed this work for less than two years between November 2013 and July 2015, he did not perform the job long enough to learn it. (R. 73-75.) As a result, the ALJ disregarded the "estimator" position as it related to Plaintiff's past relevant work. (R. 75-76.)

Regarding Plaintiff's position as a maintenance engineer in 2010 to 2011, the VE classified it as "stationary engineer" per the DOT, code 950.382-026, medium/skilled work that was performed at the light strength classification, with an SVP of 7. (R.70-71.) Because Plaintiff performed that work for 15-16 months, the ALJ found that duration did

not rise to an SVP of 7 but rather would be an SVP of 6  because Plaintiff did not perform it long enough to master the skills required by SVP 7.  (R. 71.)  Accordingly, the ALJ ruled that "stationary engineer" was not past relevant work.  (R. 71-72.)  Using this same reasoning, because Plaintiff performed the work labeled as "plumber's helper" for two months and given that the SVP of 4 as assessed to "plumber helper" in the DOT requires three to six months to learn the job, the ALJ noted that she was not considering the "plumber helper" position as Plaintiff's past relevant work.  (R. 72.)

As to Plaintiff's work as a general clerk held for a month in 2011, the ALJ noted that on his work history report, Plaintiff described this position as "put[ting] stickers on military equipment," "walking two hours, standing two hours, [and] sitting two hours." (R. 67.)  The VE recognized that the prior administrative law judge that ruled on Plaintiff's previous disability claim labeled this job as "tagger."  (R. 67-68.)  However, because the administrative law judge did not describe the "tagger" position or assign a DOT number to it, the ALJ asked the VE whether the job as described by Plaintiff in his work history report corresponded to a job in the DOT, to which the VE responded "there is something called a marker, but that's where an individual marks and attaches price tags to articles of merchandise to record the price and identifying information."  (R. 68.) Given that description, the ALJ asked Plaintiff whether he attached prices to items and he answered "no," noting that the stickers he attached were "round . . . little green thing[s] and [he] had to use a chilly . . . knife to peel it off and [he'd] very carefully put it on the military item," and that the stickers were then scanned for identification purposes.  (R. 69.)  The ALJ thus concluded that Plaintiff's description of his job was similar to that of a

"marker" per the DOT.  (*Id.*)  The ALJ then asked the VE what she would describe the job as, and the VE responded that she "would classify that as marker" with a DOT code of 209.587-034, light/unskilled job with an SVP of 2, performed at light strength classification due to the time Plaintiff spent on his feet.  (R. 69-70.)  According to the VE, based on an SVP of 2, the vocational training for the "marker" job is a short demonstration of up to thirty days, and in her opinion, a day or two (to a week at most) was enough time to learn the job.  (R. 70.)

Accordingly, the ALJ concluded that for purposes of hypotheticals, the relevant jobs to be considered were "assistant construction superintendent" and "marker" only. (R. 77.)  The ALJ then posed the following first hypothetical individual:

> [A]ssuming an individual the same age, education and work experience as the claimant; able to perform work at the light exertion level as set forth in the regulations, but with only occasional reaching overhead bilaterally; frequent handling, fingering and reaching in all other directions with the right upper extremity; occasionally stooping, kneeling, crouching, crawling and climbing and no more than occasional exposure to vibrations.  Would either of the past jobs fit within this hypothetical?

("First Hypothetical") (R. 77.)  In response, and based on her years of experience and knowledge of the "marker" and "assistant construction superintendent" jobs, the VE testified that "both of these jobs would remain, both per the DOT and as performed," except for the occasional overhead reaching bilaterally.  (R. 77-78.)

The ALJ asked if either the "marker" or "assistant construction superintendent" jobs would be eliminated if she were "to add on a limitation to no exposure to potential hazards such as moving machinery or unprotected heights and changed the posturals a little bit to no kneeling or crawling and no climbing ladders, ropes or scaffolds" (the

"Second Hypothetical"), to which the VE responded "it would eliminate the assistant construction superintendent [job] due to the need to climb" and kneel occasionally, however, the "marker" job would remain.  (R. 78-79.)

The ALJ then inquired if changing the limitations in the First Hypothetical to no reaching overhead bilaterally, frequent reaching in all other directions, and frequent handling and fingering bilaterally would change the availability of Plaintiff's past jobs of "marker" and "assistant construction superintendent."  (R. 79.)  Basing her opinion regarding overhead reaching on her experience and knowledge of the job of a "marker," the VE responded "no."  (*Id.*)

Plaintiff's attorney asked the VE if the "marker" job would still be available as it is typically performed if he were to add a limitation to the Second Hypothetical that the individual can only be on his or her feet (stand or walk) for no more than "six hours out of eight hours, meaning they'd have to be off their feet for two hours," and the VE responded that the "marker" job would remain because the hypothetical individual can either sit or stand when performing the job of a "marker" given that the individual would be marking military items and the work is usually "performed at a bench type of setting or even if it is performed on an assembly line, there are some tolerances for individuals to sit or stand."  (R. 80-81.)  Upon clarification from Plaintiff that he marked computer components for jets at various locations and performed this task entirely on his feet, the VE noted, and Plaintiff confirmed, that his job entailed him "put[ting] these stickers and then inventori[ng] them so that if they needed to deploy . . . they would scan that item and ship it to where they . . . needed to take it" and because it was already on an

operational base, Plaintiff needed to go to where the equipment was to place the stickers

on them.  (R. 81-85.)  Given this description, the VE opined that she was not certain

Plaintiff's work tasks in that job fit that of a "marker" as provided in the DOT, and as a

result, she explored the "inventory clerk" category in the DOT to determine whether

Plaintiff's job description better fit "inventory clerk" but determined that "inventory

clerk" involved a little bit more than Plaintiff's tasks as a "marker" entailed.  (R. 85-86.)

Based on this, Plaintiff's attorney stated: "we can agree that there's not an accurate

depiction in the DOT for this position" and the VE responded "that's a fair statement.

Yes." (R. 88.)  Plaintiff's attorney then asked the VE whether Plaintiff's job was a

composite job that incorporated elements of "marker" and "inventory clerk."  (R. 88.)

The following discussion then ensued between the ALJ, the VE, and Plaintiff's attorney:

> ALJ:   I'm not sure that those would be the two that's the composite, based
> on what she's saying, that the inventory clerk really involves a lot
> more than he was doing.  The marker is more consistent with what
> he's doing, except for he's moving about more than a typical marker,
> is my understanding.
>
> VE:     Right.
>
> ALJ:   A typical marker is sitting at a desk or at a table or a line and just
> tag/tag/tag.
>
> VE:     Correct.
>
> ALJ:   And he's moving around the place and tagging.  To me, it sounds like
> it's marker, but actually performed not at sedentary, but light or
> maybe, you know, a little bit differently.  And you're saying marker
> could potentially be a bench assembly position, but not as he actually
> performed it?
>
> VE:     That's correct.

ALJ:    Because light is standing or walking.  So you're saying a marker is light.  Normally they're at their – their feet, right in front of the table.  He was walking more?

VE:    Right, correct.

ALJ:    And he didn't sit for two hours a day –

Atty:    Right.

ALJ:    - - as performed, but I'm not sure – I mean, to me, it still sounds like the best description based on – he's really actually just tagging things.

Atty:    But given the bifurcated standard in terms of – I think if someone is limited to six hours of standing and/or walking, total, they can't perform this marker job as the claimant performed it, correct?

VE:    Yes, I think that would be a fair statement.

Atty:    And if we determine that there's no job in the DOT that actually describes this position --

ALJ:    Then we can't do it to the DOT, I know.  I mean, I understand –

Atty:    Well, as its typically performed.

ALJ:    -- or at least – I mean, sometimes it's not the exact.  I mean, most times it's not the exact position and the same title as the DOT has.  So that's where it really comes down to you, do you feel, in your opinion, does marker really describe the position as it would generally be performed and his performance is a variant of that occupation or is it truly a job that we just have no description for and so then I can only look to how he actually performed it?

(R. 88-90.)  In response to the above question, the VE testified: "if we look at just the description, marks and attaches price tickets to articles of merchandise to record price and identifying information, if we look at just that description, we have marking and attaching and it's . . . identifying information."  (R. 90-91.)  The VE then concluded: "while the DOT does not describe the work as he performed it, I believe the fact that we

have that many skills or job duties pass within the description, it is a marker, yes" but not as Plaintiff actually performed it. (R. 90-91.) The VE further testified that she believed "marker" was the most accurate DOT to describe Plaintiff's job and was a fair description of his position. (R. 91.)

Plaintiff's counsel then added a limitation to the Second Hypothetical regarding the hypothetical individual being limited to standing and/or walking for six hours out of an 8-hour workday and using the dominant upper extremity for handling and fingering occasionally, and asked the VE if such an individual could perform any of Plaintiff's past relevant work as a "marker" or "assistant construction superintendent," and the VE responded "no." (R. 94.) Plaintiff's counsel further posed "an entirely separate hypothetical individual" who, secondary to his or her pain, would be off task twenty percent of the time, and asked whether such an individual would be tolerated in any competitive setting, to which the VE answered "no." (*Id.*) Finally, Plaintiff's counsel asked the VE whether based on the Plaintiff's testimony, if a person that would be absent from the workplace two days a month on a consistent basis "due to having bad days of pain," would be tolerated, and the VE responded "no," noting that her response was based on her experience and review of time studies which have shown the "acceptable tolerance for off-task behavior is no more than ten percent of the workday in addition to customary breaks and the acceptable tolerance for absenteeism at the unskilled level . . . is approximately eight to nine days per year." (R. 94-95.)

### III.    <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'"  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").  In reviewing the ALJ's decision, the court considers the following:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

27

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

*Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1026 (D. Minn. 2010) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

## IV.    DISCUSSION

Plaintiff makes three overarching challenges to the ALJ's decision.  First, Plaintiff asserts that the ALJ failed to consider all of his severe impairments.  (Dkt. 22 at 13-16.) Second, Plaintiff argues that the RFC assigned to him by the ALJ is not supported by substantial evidence because the decision fails to provide a function-by-function assessment of Plaintiff's ability to perform work-related activities.  (*Id.* at 16-19.)  Third, Plaintiff argues that the ALJ mischaracterized his past relevant work because he did not meet the requirements of marker and project/assistant construction superintendent and that the ALJ's reliance on the VE's testimony was problematic.  (*Id.* at 19-27.)

The Court addresses each argument below.

## A.    Whether the ALJ Adequately Considered Plaintiff's Impairments

Plaintiff argues that the ALJ erred at step two of the evaluation process by making a cursory label of his severe impairments, that is, "degenerative joint disease and degenerative disc disease of the lumbar spine," which failed to identify the affected joints and adequately address "other severe impairments."  (*Id.* at 13-16.)  In particular,

28

Plaintiff argues that the ALJ disregarded Plaintiff's "long history of difficulties with his left upper extremity," his "degenerative joint disease of his knees bilaterally," and his "degenerative disc disease of his cervical spine." (*Id.* at 14-15.) Defendant responds that the ALJ was not required to specify the degenerated joints and that because the ALJ addressed and considered Plaintiff's left shoulder, knees, and neck impairments in reaching Plaintiff's residual functional capacity ("RFC"), any error was harmless. (Dkt. 24 at 5-9.)

"The medical severity of [a claimant's] impairment(s)" is considered at the second step of the sequential evaluation process. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment must "significantly limit" the claimant's "physical or mental ability to do basic work activities . . ." 20 C.F.R. § 404.1520(c); *see also Kirby v. Astrue*, 500 F.3d 705, 707-708 (8th Cir. 2007). Unless expected to result in death, the claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The claimant has the burden of demonstrating a severe medically determinable impairment or combination of impairments at this step of the evaluation. *Kirby*, 500 F.3d at 707-708. A claimant's "age, education, and work experience" are not relevant to the step two inquiry. 20 C.F.R. § 404.1520(c). Instead, "medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *4 (S.S.A. 1985).

The Court first considers Plaintiff's arguments based on his bilateral knees and left shoulder. As discussed above, the ALJ found at step two that Plaintiff's severe

impairments were significant for "degenerative joint disease and degenerative disc disease of the lumbar spine" (R. 17), but did not identify the joints at issue.  However, the ALJ discussed the affected joints, that is, Plaintiff's bilateral knees and left shoulder, when assessing the RFC at step four.  (R. 18-20.)  Nevertheless, Plaintiff argues that because the ALJ failed to specifically identify his knees and left shoulder at step two, "the reader is left uncertain as to whether the proper impairments have been considered." (Dkt. 22 at 14-15.)  Assuming for the purposes of this Report and Recommendation that the ALJ's failure to specifically identify Plaintiff's knees and left shoulder at step two would constitute an error, the Court considers whether that alleged error is cause for remand or reversal.

Courts have been split regarding whether an error at step two can be harmless and the Eight Circuit has not provided clear direction.  *See Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007); *see also Lund v. Colvin*, No. 13-cv-113 JSM, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (finding "[s]ome Courts have interpreted *Nicola* to mean that an error at step two can never be harmless.") (collecting cases); *Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe.").  Other courts, including other courts in this District, have refused to interpret *Nicola* as establishing a *per se* rule that any error at step two is a reversible error.  *See Lund*, 2014 WL 1153508, at *26 (collecting cases).  This Court has previously discussed that:

> [T]he prevailing view of courts in this District has been that an error at step two may be harmless where the ALJ considers all of the claimant's impairments, regardless of whether they were found severe or non-severe, in the evaluation of the claimant's RFC. *See, e.g.*, *Rosalind J.G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *20 (D. Minn. Mar. 27, 2019) ("Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual functional capacity."); *David G. v. Berryhill*, No. 17-cv-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); *Tresise v. Berryhill*, No. 16-cv-3814 (HB), 2018 WL 1141375, at *5 (D. Minn. Mar. 2, 2018) ("Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when the ALJ fails to consider the omitted impairments in the RFC."); *Lorence v. Astrue*, 691 F. Supp.2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity.") (citation omitted). Such a finding is consistent with the Commissioner's regulations. *See* 20 C.F.R. § 404.1545(a)(1)-(2) (an ALJ must consider all relevant evidence, including non-severe impairments, in his RFC determination).

*Vicky R. v. Saul*, Case No. 19-cv-2530 (ADM/ECW), 2021 WL 536297, at *11 (D. Minn. Jan. 28, 2021), *R.&.R. adopted sub nom.*, 2021 WL 533685 (D. Minn. Feb. 12, 2021); *see also Neil M. v. Saul*, Case No. 19-cv-2434 (ECW), 2020 WL 5798488, at *16 (D. Minn. Sept. 29, 2020) (same).

Here, the record is clear that the ALJ considered Plaintiff's testimony and medical record relating to his bilateral knees and left shoulder issues in determining the RFC at step four.  (R. 19-20.)  The ALJ noted at step four that Plaintiff "testified that using his arms, looking up and down, standing, and bending his knees limits his ability to work. He reported a history of bilateral knee surgery."  (R. 19.)  The ALJ further discussed Plaintiff's medical records, noting that Plaintiff had an x-ray of his left knee on June 13,

2017 which showed degenerative changes, an MRI of his left knee on July 7, 2017 that showed a meniscus tear or fray with mild chondromalacia and mild osteoarthritis, and underwent a left knee arthroscopy surgery on August 11, 2017. (R. 19-20.) The ALJ discussed Plaintiff's MRI of his shoulder, which showed severe supraspinatus tendinosis with high-grade partial tearing involving greater than fifty percent of the tendon thickness; noted that Plaintiff underwent a left shoulder arthroscopic rotator cuff repair on October 13, 2017; and discussed the MRI of Plaintiff's left shoulder taken on April 2, 2018, which showed a post rotator cuff tear, subscapularis tendinosis, and degenerative arthrosis of the AC joint. (R. 20.) As to Plaintiff's right knee, the ALJ noted that Plaintiff underwent a right knee arthroscopic partial medial meniscectomy on February 8, 2019. (R. 20.) Because the record is clear that the ALJ considered Plaintiff's bilateral knees and left shoulder when formulating the RFC at step four, any potential error at step two from the ALJ's failure to specifically identify those joints as suffering from severe impairment was harmless. *See Vicky R.*, 2021 WL 536297, at *11 (no error in failing to identify impairments as severe at step two when impairments are considered in formulating the RFC) (collecting cases).

Plaintiff also argues that the record shows he suffers from degenerative disc disease of the cervical spine, and that the ALJ erred in failing to identify this as a severe impairment at step two. (Dkt. 22 at 15.) Even if it was error for the ALJ to not identify degenerative disc disease of Plaintiff's cervical spine as a severe impairment at step two, that error was harmless. At step four, the ALJ noted that "[t]he majority of the claimant's treatment for back pain is prior to his alleged onset date and during his prior claim of

32

disability," but "still considered it when evaluating the claimant's residual functioning

capacity." (R. 19.) In addition, the ALJ stated that she had "**considered the neck,**

**shoulder, and back complaints and objective findings and has limited postural and**

**reaching accordingly**." (R. 21 (emphasis added).) Therefore, based on the record, the

ALJ considered Plaintiff's neck impairments in making the RFC determination at step

four and incorporated limitations based on those impairments. Accordingly, the Court

finds that any error stemming from the ALJ's failure to specifically identify Plaintiff's

alleged cervical spine disease at step two was harmless. *See Jerome S. v. Saul*, Case No.

19-cv-931 (ECW), 2020 WL 5798550, at *10 (D. Minn. Sept. 29, 2020) (collecting cases

and finding that "in ascertaining the applicability of the harmless error analysis to an

error at step two, the Court does not distinguish between situations where the error being

assigned is the failure to classify an impairment as severe and, as here, the failure to

address an impairment—so as long as the impairment is addressed in the evaluation of a

claimant's RFC.").

In making his step two argument, Plaintiff relies on Dr. Mast's medical source

statements and letters, along with Plaintiff's testimony, to support his argument that the

ALJ failed to adequately address all relevant severe impairments, resulting in "an

inadequate RFC." (Dkt. 22 at 15-16.) But the ALJ considered those impairments,

including Dr. Mast's opinions and Plaintiff's testimony, when formulating the RFC. (R.

21-22.) As discussed, "the prevailing view of courts in this District has been that an error

at step two may be harmless where the ALJ considers all of the claimant's impairments,

regardless of whether they were found severe or non-severe, in the evaluation of the

claimant's RFC." *Vicky R.*, 2021 WL 536297, at \*11. Thus, Plaintiff's reliance on Dr. Mast's opinions and Plaintiff's testimony likely does not change the analysis because the record is clear that the ALJ took into account Plaintiff's knees, left shoulder, and cervical spine issues when formulating the RFC.

The Court could generously construe Plaintiff as challenging the RFC as to Plaintiff's ability to be on his feet (e.g., stand and walk) and postural limitations or arguing that any step two error was not harmless based on Plaintiff's arguments that "Dr. Mast has opined on multiple occasions that these severe impairments limit [Plaintiff's] ability to be on his feet for prolonged periods, and in his ability to kneel, crouch, crawl and stoop" and "Dr. Mast limited him to no overhead reaching and only occasional reaching in all other directions." (*See* Dkt. 22 at 16.) Because these arguments are focused on the RFC, the Court will address any such in Section IV.B.2.

**B.    The Adequacy of the RFC**

The Court turns to Plaintiff's challenge to the RFC. Plaintiff explicitly challenges the RFC as "insufficient" on the ground that the ALJ failed to engage in the required function-by-function analysis and also, as discussed in Section IV.A, suggests the RFC was "inadequate" because the ALJ did not identify Plaintiff's bilateral knees, left shoulder, and cervical spine impairments as severe at step two.

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence.").

The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).  "Some medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (citations omitted) (cleaned up).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).  "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  The claimant bears the burden of establishing his or her RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted).

According to Social Security Ruling 96-8p, the "RFC assessment must first identify the [claimant]'s functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . Only after that may RFC be expressed in terms of the exertional levels . . ." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "[A] failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" *Depover v. Barnhart*,

349 F.3d 563, 567 (8th Cir. 2003) (quoting SSR 96-8p, 1996 WL 374184, at *1).  The court "review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but [does] not require an ALJ to mechanically list and reject every possible limitation."  *McCoy*, 648 F.3d at 615.

### 1.    Social Security Ruling 96-8p and Dr. Chang's Opinion

Plaintiff argues that the RFC determined by the ALJ does not satisfy the requirements of Social Security Ruling 96-8p because it limits Plaintiff to performing light work as defined in 20 CFR § 404.1567(b) but fails to address his specific abilities to stand, walk, or sit.  (Dkt. 22 at 17-19.)  The limitation Plaintiff identifies as omitted is that of standing and/or walking (with normal breaks) for about six hours in an 8-hour workday, based on state agency medical consultant Dr. Chang's opinion on reconsideration.[5]  (*See id.* at 18-19.)  In response, Defendant contends that because the definition of light work incorporates standing or walking for six hours out of an 8-hour workday, the ALJ was not required to specify any standing and/or walking limitations in the RFC beyond restricting Plaintiff to light work.  (Dkt. 24 at 10-11.)

When determining the physical exertional levels of work in the national economy, jobs are classified "as sedentary, light, medium, heavy, and very heavy."  20 C.F.R. § 404.1567.  Light work involves "frequent lifting or carrying of objects weighing up to

---

[5]    The Court understands Plaintiff to be arguing that the RFC should have specifically included a limitation of 6 hours of standing and/or walking based on Plaintiff's arguments about Dr. Chang's opinion and Plaintiff's past relevant work.  (*See, e.g.*, Dkt. 22 at 18-19.)  Plaintiff did not propose a different limitation for standing and/or walking.

10 pounds" and "[s]ince frequent lifting or carrying requires being on one's feet up to

two-thirds of a workday, the full range of light work requires standing or walking, off and

on, for a total of approximately six hours of an 8-hour workday.  Sitting may occur

intermittently during the remaining time."  20 C.F.R. § 404.1567(b); SSR 83-10, 1983

WL 31251, at *5-6.

> The ALJ found Plaintiff had the RFC:
>
> [T]o perform light work as defined in 20 CFR 404.1567(b) except the
> claimant can occasionally reach overhead bilaterally.  He can frequently
> handle, finger, and reach in all other directions with the right, upper
> extremity.  He can occasionally stoop, kneel, crouch, crawl, and climb.  He
> can tolerate no more than occasional exposure to vibrations.

(R. 18.)

The ALJ incorporated "light work as defined in 20 C.F.R. § 404.1567(b)" in the

RFC.  (R. 18.)  Per the regulation and SSR 83-10, light work involves "frequent lifting or

carrying of objects weighing up to 10 pounds" and "[s]ince frequent lifting or carrying

requires being on one's feet up to two-thirds of a workday, **the full range of light work**

**requires standing or walking, off and on, for a total of approximately 6 hours of an**

**8-hour workday**.  Sitting may occur intermittently during the remaining time."  20

C.F.R. § 404.1567(b) (emphasis added); SSR) 83-10, 1983 WL 31251, at *5-6.  In other

words, the very definition of light work, which the ALJ incorporated into the RFC by

reference, limits Plaintiff to standing and/or walking for a total of six hours in an 8-hour

workday.  Consequently, the Court rejects Plaintiff's argument that the RFC does not

comply with SSR 96-8p because it does not address his "specific abilities to stand and/or

walk as well as sit."

Plaintiff further argues that the ALJ did not consider Dr. Chang's opinion in its entirety because the ALJ excluded his opinion as to "standing and/or walking (with normal breaks) for a total of '[a]bout 6 hours in an 8-hour workday'" from the RFC. (*Id.* at 18.) On the contrary, because light work is defined as standing or walking for a total of approximately six hours of an 8-hour workday, the RFC considered and is consistent with Dr. Chang's opinion that Plaintiff could "[s]tand and/or walk (with normal breaks) for a total of: [a]bout 6 hours in an 8-hour workday." (R. 176.) The Court therefore rejects the argument that the RFC failed to include Dr. Chang's opinion as to this limitation.

### 2.    Dr. Mast's Opinions and Plaintiff's Testimony

The Court next considers Plaintiff's potential argument that the RFC was "inadequate." (Dkt. 22 at 16.) This argument is premised on Plaintiff's step two argument, which relies on Dr. Mast's opinions and Plaintiff's testimony when asserting a step two error based on a "failure to adequately address all relevant severe impairments," namely Plaintiff's left shoulder, knees, and neck impairments. (*Id.*) As explained in Section IV.A, the Court understands this to be an argument that the RFC should have incorporated additional or different limitations directed to those impairments based on that evidence or that any step two error was not harmless because the RFC did not do so.

The Court first considers the ALJ's treatment of Dr. Mast's opinions, which the ALJ considered when assessing the RFC. (R. 21.) Because Plaintiff's claim was filed after March 27, 2017, the applicable regulation is 20 C.F.R. § 404.1520c. *See Pa M. v. Kijakazi*, No. CV 20-741 (BRT), 2021 WL 3726477, at *6 n.7 (D. Minn. Aug. 23, 2021)

("Since Plaintiff's claim was filed after March 27, 2017, § 404.1527 does not apply

because § 404.1520c supersedes any previous statutory requirements.") (citing 20 C.F.R.

§ 404.1520c).  Pursuant to § 404.1520c,

> [An ALJ] will not defer or give any specific evidentiary weight, including
> controlling weight, to any medical opinion(s) or prior administrative medical
> finding(s), including those from [a claimant's] medical sources.  When a
> medical source provides one or more medical opinions or prior
> administrative medical findings, [the ALJ] will consider those medical
> opinions or prior administrative medical findings from that medical source
> together using the factors listed in paragraphs (c)(1) through (c)(5) of this
> section, as appropriate.  The most important factors [an ALJ] consider[s]
> when [the ALJ] evaluate[s] the persuasiveness of medical opinions and prior
> administrative medical findings are supportability (paragraph (c)(1) of this
> section) and consistency (paragraph (c)(2) of this section).

20 C.F.R. § 404.1520c(a).  Those factors include "the supportability and consistency of

medical opinions and may consider the relationship with the claimant, specialization, and

other factors."  *Pa M.*, 2021 WL 3726477, at *6.

The ALJ was not persuaded by Dr. Mast's opinions because they were "not

generally consistent with the record as a whole"; because Dr. Mast's February 2018

opinion did not support his August 2019 opinion; and because Dr. Mast failed to explain

the differences for the changes in his February 2018 and August 2019 opinions.[6]  (R. 21.)

The ALJ noted that Plaintiff had received "little treatment for visual and hearing

deficits," rendering Dr. Mast's opinions as to visual and hearing limitations inconsistent

with the record as a whole.  (R. 21.)  Further, as the ALJ noted, there were unexplained

changes in Dr. Mast's opinions from February 2018 and August 2019.  (R. 21.)  These

---

[6]    The ALJ erroneously referred to Dr. Mast's August 23, 2019 medical source
statement as an "opinion of August 2018."  (R. 21.)

included (1) an increase in how many hours Plaintiff could walk from "less than 2 hours" in February 2018 to "at least 2 hours" in August 2019 (*compare* R. 873, *with* R. 1006), and (2) increased postural limitations from Plaintiff being able to occasionally climb, balance, kneel, crouch, crawl, and stoop in February 2018 but, as of August 2019, could never kneel, crouch, or crawl (*compare* R. 875, *with* R. 1007.) In February 2018, rather than identifying "medical/clinical findings" supporting his opinions as to Plaintiff's ability to sit, stand, walk, push, and pull, Dr. Mast gave a non-responsive answer that stated additional limitations. (R. 874 ¶ 7.) In the August 2019 medical source statement, Dr. Mast identified "[s]evere degen[erative] arthritis" as the relevant finding. (R. 1007 ¶ 7.) Finally, Dr. Mast reused copies of a March 11, 2015 letter, simply re-dating them with February 20, 2018 and August 23, 2019, without any discussion of the effect of Plaintiff's surgeries in 2017 to 2019 other than opining that the "poor outcome" from his left shoulder arthroscopy resulted in "severe limitations." (R. 877-878, R. 1010-1011.)

As to Plaintiff's left shoulder, Dr. Mast opined that Plaintiff could never reach overhead on the left in February 2018 (R. 875) and August 2019 (R. 1008). But, as the ALJ noted, Dr. Rust believed on April 10, 2018 that Plaintiff might find relief six to twelve months after his shoulder surgery and suggested cortisone injections and home therapy exercises. (R. 20, 937.) As of July 10, 2018, Plaintiff reported to Dr. Rust that the injection helped "a little bit" and his strength and mobility were slowly improving. (R. 930.) On January 3, 2019, Plaintiff reported to Dr. Rust that his left shoulder was doing well. (R. 921.)

As to Plaintiff's bilateral knees and cervical spine issues, the ALJ also considered other medical evidence in the record, including that relating to Plaintiff's knees and the fact that "[t]he majority of the claimant's treatment for back pain is prior to his alleged onset date and during his prior claim of disability." (R. 19-21.) The medical records relating to Plaintiff's degenerative disc disease of his cervical spine that Plaintiff relies on date from around 2010, years before the alleged onset date. (R. 436, 497-498.) While he reported increased neck and back pain in May 2019 (R. 894-895), as of June 3, 2019, those reports had ceased (R. 900-901). On January 3, 2019, Plaintiff reported that his left knee was doing well. (R. 921.) Plaintiff did complain of increasing pain in his right knee at that time, and an MRI taken a few days later showed a tear of the medial meniscus and mild chondromalacia of the medial and patellofemoral compartments, but not severe arthrosis. (R. 921-924.) Plaintiff underwent a right knee arthroscopic partial medial meniscectomy on February 8, 2019. (R. 912.) As of April 18, 2019, Plaintiff had some stiffness start-up pain and achiness in his right knee and difficulty bending or kneeling, but overall, he had less frequent locking and swelling than preoperatively, was happy with how his knee felt, and the report shows his incisions were healing nicely with no signs of infection. (R. 904-06.) Plaintiff began physical therapy, and as of June 6, 2019, when he reported bilateral knee pain and minimal overall changes in his right knee, he

was advised to continue with home exercises and follow up with Dr. Rust if there were no changes in the next month or two.  (R. 889-901.)[7]

Further, Dr. Chang opined that Plaintiff could occasionally reach overhead with the left, upper extremity, could stand and/or walk for six hours in an 8-hour workday, and could occasionally perform postural activities, including kneeling, crouching, and crawling.  (R. 176-177.)  These opinions took into account the surgery performed on Plaintiff's left knee, barring "any unusual complication," and his anticipated shoulder surgery.  (R. 176-177.)  Plaintiff has not identified any unusual complication from any of his surgeries that would call into question Dr. Chang's opinions.  The ALJ does not err when relying on the opinions of "consultative examiners, non-examining testifying experts, and non-examining [s]tate [a]gency consultants," when the opinions are supported by the record as a whole.  *Belinda B. v. Saul*, No. 20-cv-488 (JRT/LIB), 2021 WL 537932, at *12 (Jan. 28, 2021) (collecting cases).  "Courts have routinely upheld ALJ decisions that give significant weight to the opinions of consultative examiners, testifying experts, and state agency consultants when the ALJ's decision to do so is supported by substantial evidence in the record."  *Id.* at *13 (collecting cases).  Here, the ALJ found Dr. Chang's opinion "persuasive" and that Dr. Chang's "opinion [was] generally consistent with the record as a whole including but not limited to some of

---

[7]    Plaintiff did not provide any records indicating he followed up with Dr. Rust before the September 20, 2019 hearing, and agreed the record was complete as of that date.  (R. 32.)

[Plaintiff's] activities of daily living such as shopping, driving, and painting." (R. 22.) The Court sees no error in that determination.

In sum, substantial evidence supports the ALJ's determination that Dr. Mast's opinions were inconsistent with the record as a whole and not supported, including due to inconsistencies between the February 2018 and August 2019 opinions and a lack of explanation for any changes. *See Fatuma A. v. Saul*, No. 19-CV-3160 (WMW/LIB), 2021 WL 616522, at *7-10 (D. Minn. Jan. 26, 2021) (applying 20 C.F.R. § 404.1520c and finding ALJ's determination that treating physician's opinions were inconsistent with the record and less persuasive than state agency consultant's opinions supported by substantial evidence), *R.&R. adopted*, 2021 WL 615414 (D. Minn. Feb. 17, 2021). For these reasons, to the extent Plaintiff argues that Dr. Mast's opinions render the RFC inadequate or insufficient or that Dr. Mast's opinions show the failure to identify Plaintiff's bilateral knees, left shoulder, and cervical spine issues as severe impairments was not harmless error at step two, the Court finds those arguments unpersuasive.

As to Plaintiff's testimony, the ALJ explained:

[S]tanding and bending his knees limits his ability to work. [Plaintiff] reported a history of bilateral knee surgery. Consequently, he indicated that he can stand about 15 to 20 minutes at one time. He estimated that he can walk about 1 mile in an entire day. On a great day, he estimated that he can walk about 3 or 4 blocks at one time. On a bad day, he estimated that he can walk to and from the restroom before he would need to rest. He stated that his tail bone is removed, which makes it difficult for him to sit in a chair.

(R. 19.) Nevertheless, the ALJ found those allegations not completely consistent with the record as a whole, including the fact that Plaintiff was painting his house in September 2017 and reported that he drives and shops, and that the medical evidence shows that his

surgeries were "generally successful in relieving the symptoms," including improvement after Plaintiff's left shoulder surgery and right knee surgery. (R. 22.) The Court finds that substantial evidence supports the weight the ALJ assigned to Plaintiff's testimony.

As such, to the extent Plaintiff challenges the ALJ's treatment of Dr. Mast's opinions and Plaintiff's testimony in formulating the RFC, the Court finds the weight assigned to those opinions and that testimony supported by substantial evidence and as a result, any step two error would be harmless.

### 3. The VE's Testimony as to Plaintiff's Functional Limitations

Plaintiff argues that because the VE testified that an individual that is limited to standing and/or walking for a total of six hours in an eight-hour day cannot perform Plaintiff's "marker" job as he performed it, the ALJ erroneously concluded that he could perform his past relevant work. (Dkt. 22 at 18-19.) As further discussed in Section IV.C.1, the Court is not persuaded that the VE's testimony in response to Plaintiff's hypothetical is cause for reversal or remand.

### C. The ALJ's Characterization of Plaintiff's Past Relevant Work

After assessing Plaintiff's RFC, the ALJ found at step four that Plaintiff could return to his past relevant work as a marker, which has a DOT code of 209.587-034, and noted that the marker job "is unskilled work with a specific vocational preparation of 2. It is generally performed at the light exertional level, and the claimant performed it at the light exertional level." (R. 22.) The ALJ also found that Plaintiff could return to his past relevant work as a project manager, DOT code 869.367-010, which "is skilled work with

a specific vocational preparation of 7. It is generally performed at the sedentary exertional level, and the claimant performed it at the sedentary exertional level." (*Id.*)

A claimant bears the burden of showing the inability to perform past relevant work at step four. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994) (citing *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986)). "Past relevant work is work that [a claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1). "The regulations provide that the ALJ may elicit testimony from a vocational expert in evaluating a claimant's capacity to perform past relevant work." *Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) (citing 20 C.F.R. § 404.1560(b)(2)); *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996). The Eight Circuit has found that an ALJ may rely on the testimony of a vocational expert in determining a claimant's past relevant work. *See Wagner*, 499 F.3d at 854. In determining "what a typical job description is in the 'national economy,' an ALJ may take notice of job information in the Dictionary of Occupational Titles." *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (citing *Evans v. Shalala*, 21 F.3d 832, 834 (8th Cir. 1994); 20 C.F.R. § 404.1566(d)(1)). "The ALJ must be careful not to characterize the specific work a claimant performed too broadly by using a generic job description." *Id.* If the ALJ determines that a claimant can perform his past relevant work at step four, the claimant is deemed not disabled. *See Gaddis*, 76 F.3d at 896. The ALJ's finding that a claimant is not disabled is appropriate if the claimant retains the RFC to perform: (1) "[t]he actual functional demands and job duties of a particular past relevant job" or (2) "[t]he functional demands and job duties of the

45

occupation as generally required by employers throughout the national economy.

*Wagner*, 499 F.3d at 853 (citations omitted).

Plaintiff argues that the ALJ mischaracterized his past relevant work and that

neither the job of "marker" or "project manager" are past relevant work.  (Dkt. 22 at 19-

27.)  In response, Defendant argues that substantial evidence supports the ALJ's findings

that Plaintiff was not disabled and could perform his past relevant work as marker and

project manager.  (Dkt. 24 at 11-16.)

### 1.    Marker

The first job identified by the ALJ as past relevant work is that of "marker."

"Marker" is defined in pertinent part as: "Marks and attaches price tickets to articles of

merchandise to record price and identifying information: Marks selling price by hand on

boxes containing merchandise, or on price tickets."  DICOT 209.587-034 (G.P.O.), 1991

WL 671802.  In a work history report filled out by Plaintiff in 2012 in connection with an

earlier disability claim, Plaintiff described his work as a general clerk for a month in 2011

(the job characterized as "marker") as: "Put stickers on military items" and "[r]ecorded

item on a hand held device."  (R. 302.)  He stated that he walked thirty minutes a day,

stood two hours a day, and sat four hours a day.  (R. 302.)  Plaintiff completed another

work history report in August 2017 in connection with this current disability claim

wherein he described the "general clerk" job as "put[ting] stickers on military

equipment," and stated that each day, the job required him to walk for two hours, stand

for two hours, and sit for two hours.  (R. 326.)  At the hearing, after Plaintiff's testimony

regarding his role in another job did not match with his work history report and that he

"can't remember stuff from two days ago," the ALJ said she would "tend to rely more on the work history report that was completed closer to when the actual work was done." (R. 38-39.)  When asked if he wanted to "argue anything against that," Plaintiff's attorney responded: "Understood, Your Honor," and did not object.  (R. 39.)

Plaintiff described his duties in his "general clerk" job as "just put a – take a sticker off a sheet and put it on a mail – on the item."  (R. 68.)  When asked if he attached prices to items, Plaintiff answered "no," explained that the stickers he attached were "round . . . little green thing[s] and [he] had to use a chilly . . . knife to peel it off and [he'd] very carefully put it on the military item," and said that the stickers were then scanned for identification purposes.  (R. 69.)  When asked if he performed this job "seated at all," Plaintiff responded, "No, it was on my feet" and that he marked the items wherever they were located.  (R. 82-83.)  The VE testified, however, that "a typical marker is sitting at a desk or a table or a line and just tag/tag/tag" rather than "moving around the places and tagging."  (R. 88; *see also* R. 81 (VE testifying that a marker's job is "usually performed at a bench type of setting or even if it is performed on an assembly line, there are some tolerances for individuals to sit or stand").)  After some discussion between the VE and the ALJ, the VE testified that "while the DOT does not describe the work as he performed it, I believe the fact that we have that many skills or job duties pass within the description, it is a marker, yes."  (R. 90-91.)  The VE further testified that she believed "marker" was the most accurate DOT to describe Plaintiff's job and was a fair description of his position.  (R. 91.)  At the hearing, Plaintiff's attorney was given the opportunity to submit a post-hearing brief why Plaintiff's general clerk job in 2011

should not be classified as the "marker" position.  (R. 92-93.)  Instead, he rested on his

argument that the "marker" job would require Plaintiff to change industries, work

processes, tools, and settings, which he argued was impermissible given Plaintiff was 62

years old.  (R. 92-93.)

In his brief, Plaintiff argues that the VE relied on the "many skills" that she

testified would transfer from Plaintiff's general clerk job to the "marker job," but Plaintiff

would not have gained any skills to transfer because the general clerk job was unskilled.

(Dkt. 22 at 23.)  This argument ignores the VE's testimony that marking, attaching, and

identifying were present in both the "general clerk" job and the "marker" job, that

described those as "**job duties**" (as well as skills), and ultimately concluded that "marker

was a "fair description" of the general clerk position "because of those **shared duties** that

are consistent with what he actually did."  (R. 90-91 (emphases added).)  To the extent

Plaintiff now challenges that determination, the VE's opinion and Plaintiff's own

descriptions of his job constitute substantial evidence that the ALJ could rely on in

finding that Plaintiff had past relevant work as a "marker" based on his "general clerk"

job in 2011.  *See Skanes v. Astrue*, No. CIV-07-1184-HE, 2008 WL 3992150, at *5

(W.D. Okla. Aug. 22, 2008) (finding no error when ALJ relied on VE's testimony about

vocational characteristics of plaintiff's previous jobs and plaintiff's own description of

the job); *see also Wagner*, 499 F.3d at 854 (rejecting argument that "the ALJ erred in

determining that [plaintiff's] past work was the same as the sedentary job of police chief

and that he was capable of 'returning' to that past relevant work" because "the ALJ could

properly look at the "functional demands and job duties" of a "chief of police" as

required by employers in the national economy and also finding "[plaintiff's] argument that the ALJ improperly relied on the testimony of a vocational expert in determining past relevant work also fails").

Having concluded that substantial evidence supports the ALJ's determination that Plaintiff's "general clerk" job in 2011 can be classified as a "marker" job, the Court turns to Plaintiff's remaining arguments. Plaintiff next argues that the ALJ erred by relying on the VE's testimony because "a limitation to 'light work as defined in 20 CFR 404.1567(B)...' is not a function by function analysis of [Plaintiff's] abilities." (Dkt. 22 at 22.) As explained in Section IV.B.1, the Court is not persuaded by Plaintiff's argument that the ALJ was required to spell out his limitations of standing and/or walking in the RFC because the definition of "light work" incorporates Plaintiff's alleged limitation of standing and/or walking for six hours in an eight-hour workday.

Plaintiff next takes issue with the fact that the ALJ concluded: "The vocational expert testified in response to a hypothetical question accurately reflecting the claimant's residual functional capacity and vocational background. . . The vocational expert responded that the hypothetical individual could perform past work as generally and as actually performed." (Dkt. 22 at 22-23 (citing R. 22).) This argument is based on the VE's testimony that a person limited to six hours total on his feet during an 8-hour workday could not perform Plaintiff's "marker" job as he performed it because "the job [Plaintiff] performed required him to be on his feet 100% of the time." (*Id.* at 23-24.) This argument is unpersuasive for two reasons.

First, Plaintiff stated in his 2012 work history report that he sat four hours a day in the "general clerk" job (R. 302) and in his 2017 work history report that the job required him to walk for two hours, stand for two hours, and sit for two hours. (R. 326.) In view of Plaintiff's admittedly poor memory at the hearing, and the ALJ's statement that she would rely on the work history reports because they were closer in time to the actual job (Tr. 38-39), substantial evidence would support the conclusion that the Plaintiff was sitting for at least two hours when he performed the general clerk job in 2011.

Second, even if the Court assumed Plaintiff was on his feet for more than six hours a day when actually performing the general clerk job, the VE testified that a limitation of being "totally off their feet" and only standing or walking for no more than six hours would not preclude the "marker" job as typically performed because it was generally performed either sitting or standing. (R. 80-81; *see also* R. 88.) "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000); *see also Wagner*, 499 F.3d at 853 ("[Plaintiff's] argument that the ALJ erred by looking at the past relevant work as generally required by employers in the national economy necessarily fails. . . . Therefore, the ALJ could properly look at the 'functional demands and job duties' of a 'chief of police' as required by employers in the national economy."). As such, even if the ALJ were incorrect about how Plaintiff actually performed the "marker" position, the ALJ's conclusion that Plaintiff could perform the "marker" job as it is generally performed is supported by substantial evidence.

In sum, based on the record as a whole, the Court does not find cause for reversal or remand as it relates to the ALJ's decision that Plaintiff can perform his past relevant work of "marker" as he actually performed it in 2011, which is sufficient basis to find Plaintiff not disabled, or as it is generally performed in the national economy.

### 2.    Assistant Construction Superintendent/Project Manager

The second job identified by the ALJ is that of "Project Manager (DOT#869-367-010)."  (R. 22.)  That DOT code describes an "Assistant Construction Superintendent," as:

> Assists superiors in directing activities of workers concerned with construction of buildings, dams, highways, pipelines, or other construction projects:  Assists superiors in planning construction procedures, specifications, work schedules, and material needs.   Inspects work in progress to ensure that work conforms to specifications and adherence to work schedules.

DICOT 869.367-010 (G.P.O.), 1991 WL 687579 (2016).[8]  Plaintiff argues that the ALJ's conclusion that he could return to past relevant work as an assistant construction supervisor/project manager was in error because the job at issue—his job at Apex from October 2006 to February 2009—was an "estimator" job with different duties from that of an assistant construction superintendent/project manager and that even if that job could be classified as an assistant construction superintendent/project manager, he did not perform it long enough for it to constitute past relevant work.  (Dkt. 22 at 27.)

---

[8]    Plaintiff states that the ALJ mislabeled the assistant construction superintendent job as "project manager" in the decision (Dkt. 22 at 25), but the transcript is clear that the VE used the DOT title for Code 869.367.010 while the ALJ was using the "project manager" terminology (for the same code) from the earlier decision (R. 64).  The Court refers to this job as "assistant construction superintendent/project manager."

Turning to Plaintiff's first argument, in his 2012 work history report, Plaintiff listed his job title as "project manager" while working at "Apex Mechanical," but did not list the time period in which he held this job. (R. 298-300.) He stated that he worked twenty hours/week, that is four hours per day and five days a week, during which time he bid on projects, ordered materials, compared prices, met with customers, developed a customer base, and supervised, hired, and fired employees. (R. 300.) In his August 2017 work history report, Plaintiff stated that he was employed as a "project manager" at "Mechanical" from October 2006 to February 2009, described his job duty solely as "[b]id projects," and stated that he did not supervise, hire, or fire employees. (R. 323, 328.) A review of Plaintiff's earnings report shows he was employed by "Apex Mechanical" between 2006 and 2009, but do not reference his job title. (R. 263.)

At the hearing, Plaintiff testified that he worked as an estimator while employed by Apex from 2006 to 2009. (R. 38.) However, after the ALJ pointed to the inconsistencies in Plaintiff's testimony and his work history reports, Plaintiff indicated that his memory was bad. (*Id.*) As a result, the ALJ stated that she would rely on Plaintiff's work history reports for better accuracy as to his employment history, to which Plaintiff's attorney did not object. (R. 38-40.) Plaintiff's attorney did state that based on his prior discussions with Plaintiff, he was under the impression that Plaintiff worked as an estimator at Apex, but admitted that he did not match up those statements with the work history reports. (R. 43.) After noting that Plaintiff was called at the reconsideration stage for clarifications regarding his work as a project manager, and relying on Plaintiff's work history reports, the ALJ concluded that Plaintiff worked as an assistant construction

superintendent/project manager at Apex from 2006 to 2009.  (R. 40, 42-44, 63-65, 76-77.)

As referenced during the hearing before the ALJ, the Disability Determination Explanation report at reconsideration dated January 23, 2018, shows Plaintiff was called twice in September 2017 for clarifications regarding the assistant construction superintendent/project manager position.  (R. 40, 43, 179-180.)  That report states:

> [Plaintiff] did very little work inspection.  He assisted his superiors in directing construction workers.  He kept track of material needs and specifications of the construction sites.  In his work history, he describes the job as being sedentary in nature. . . .  He can go back to the job has [sic] he described it.

(R. 179-180.)

Based on Plaintiff's work history reports and description of his work at Apex Mechanical, which include assisting superiors, directing workers, and tracking material needs and specifications, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's job at Apex Mechanical can be classified as DICOT 869.367-010, Assistant Construction Superintendent.

Lastly, Plaintiff argues that the assistant construction superintendent job requires an SVP of 7 which requires two to four years to learn the job, and that because he worked as a project manager on a part-time basis (four hours per day, five days a week, for a total of twenty hours per week) from October 2006 to February 2009, he held this job for an effective period of 14-and-a-half months.  (Dkt. 22 at 26.)

"Past relevant work is work that [a claimant] ha[s] done within the past 15 years, that was substantial gainful activity, **and that lasted long enough for [the claimant] to**

**learn to do it**." 20 C.F.R. § 404.1560(b)(1) (emphasis added). The regulation provides

that an SVP of 7 is required for the assistant construction superintendent position, which

requires over "2 years up to and including 4 years" "for a typical worker to learn the

techniques, acquire the information, and develop the facility needed for average

performance . . ." DICOT 869.367-010 (G.P.O.), 1991 WL 687579 (2016); *Bayer v.

Colvin*, 557 F. App'x 280, 285 n. 2 (5th Cir. 2014). If the Court accepted Plaintiff's

argument, the assistant construction superintendent/project manager job would not be

past relevant work because he would not have worked at it for at least two years. The

Court does not find this argument persuasive. Plaintiff never raised this argument when

the ALJ identified the assistant construction superintendent/project manager job as past

relevant work (R. 76-77), and Plaintiff has not argued (much less identified evidence)

that he did not learn that job or did not competently perform any of his duties in that

position. The Eighth Circuit has found a job can qualify as past relevant work even if the

claimant worked part-time and for less than the SVP requirement if there is no evidence

the claimant did not learn the job or competently perform her duties in the job. *See Moad

v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001) (finding that a claimant that had worked

part-time in a position for less than eighteen months in a job that required two-to-four

years to learn the position satisfied the DOT requirement because "there [was] no

evidence suggesting that [the claimant] failed to learn her job as general relief director or

did not completely perform any of her duties in that position"). Under the circumstances

here, where Plaintiff worked as an assistant construction superintendent/project manager

for over two years, and when there is no evidence he did not learn his duties or

competently perform them, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's project manager job at Apex Mechanical was past relevant work.[9]

For the reasons stated above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Dkt. 21) be denied and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 23) be granted.

## V.    **RECOMMENDATION**

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff Michael T. B.'s Motion for Summary Judgment (Dkt. 21) be **DENIED** and;

2.    Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 23) be **GRANTED**.

DATED: December 3, 2021                *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

---

[9]    The VE opined that Plaintiff performed this job at a sedentary level (R. 64-65), and Plaintiff did not challenge the ALJ's conclusion that he performed it at a sedentary level (R. 22).  For this reason, the Court does not address the ALJ's statement that the project manager position is generally performed at a sedentary exertional level (R. 22), which appears inconsistent with the DOT, *see* DICOT 869.367-010 (G.P.O.), 1991 WL 687579 (2016) (identifying job as "Light Work").

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).